# EXHIBIT A

**CT Corporation**
**Service of Process Notification**
02/13/2024
CT Log Number 545751482

## Service of Process Transmittal Summary

**TO:**    Alan Nadel, Attorney
Syngenta Crop Protection, LLC
410 S Swing Rd
Greensboro, NC 27409-2012

**RE:**    **Process Served in Delaware**

**FOR:**    Syngenta Crop Protection, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: DOROTHY DIANNE ROGERS KELLY, MELISSA SAWYER, AND BOBBY DALE KELLY, INDIVIDUALLY AND ON BEHALF OF THE DECEASED BOBBY LAVELLE KELLY, AND DOROTHY DIANNE ROGERS KELLY AS THE PERSONAL REPRESENTATIVE ON BEHALF OF THE ESTATE OF BOBBY LAVELLE KELLY // To: Syngenta Crop Protection, LLC |
| **CASE #:** | 082988 |
| **NATURE OF ACTION:** | Product Liability Litigation - Personal Injury |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 02/13/2024 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/14/2024, Expected Purge Date: 02/19/2024 |
| | Image SOP |
| | Email Notification,  Carolyn Guelich  carolyn.guelich@syngenta.com |
| | Email Notification,  Alan Nadel  ALAN.NADEL@SYNGENTA.COM |
| | Email Notification,  Cheryl L Quain  cheryl.quain@syngenta.com |
| | Email Notification,  Mark Smith  mark.smith-1@syngenta.com |
| | Email Notification,  Manning Connors  manning.connors@syngenta.com |
| | Email Notification,  John Burleigh  john.burleigh@syngenta.com |
| | Email Notification,  Ayodeji Amusan  ayodeji.amusan@syngenta.com |
| | Email Notification,  Lance Arnott  sopverification@wolterskluwer.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801
866-401-8252
LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



$16.460
US POSTAGE
PRIORITY MAIL
COMBASPRICE
FROM 70508
02/09/2024
stamps
endicia



9402 7112 0823 9461 5686 11

SYNGENTA CROP PROTECTION, L.L.C
The Corporation Trust Company
1209 N ORANGE ST
WILMINGTON DE 19801-1196



## LABORDE EARLES
—— INJURY LAWYERS ——
P.O. BOX 80098   LAFAYETTE, LA 70598-0098

Syngenta Crop Protection, LLC
c/o The Corporation Trust Company
1209 N. Orange St.
Wilmington, DE 19801-1196



1901 Kaliste Saloom Rd. (70508)
P.O. Box 80098 (70598-0098)
Lafayette, Louisiana

Phone (337) 261-2617
(800) 522-6733
Fax (337) 261-1934

# LABORDE EARLES
## — INJURY LAWYERS —

Direct Phone: 337-231-0515
Email: denise@onmyside.com

02/08/2024

Syngenta Crop Protection, LLC
*Through Louisiana Long Arm Statute*
c/o The Corporation Trust Company
1209 N. Orange St.
Wilmington, DE 19801-1196

VIA CERTIFIED MAIL, RETURN RECEIPT No. 9490 9112 0623 9461 5686 58

RE:    *Dorothy Dianne Rogers Kelly, et ux. v. Syngenta Crop Protection, LLC, et al.*
       C-82988; Iberville Parish, 18th JDC, State of Louisiana

Dear Sir or Madam:

In accordance with LSA-R.S. 13:3201, *et seq.*, please find the enclosed Plaintiff's First Supplemental and Amending and Reinstated Petition for Damages and Demand for Jury Trial regarding the above-referenced matter, which is hereby served upon you pursuant to the Louisiana Long Arm Statute.

Warm Regards,

**LABORDE EARLES LAW FIRM, LLC**

Nicholas Rockforte

NR/dp

## LONG ARM CITATION
### CITATION PURSUANT TO THE PROVISIONS OF LSA-R.S. 13:3201 ET SEQ.

---

**DOROTHY DIANNE ROGERS KELLY**

*Versus*

**SYNGENTA CROP PROTECTION, L.L.C., ET AL**



*Case: 082988*
*Division: D*
*18th Judicial District Court*
*Parish of Iberville*
*State of Louisiana*

---

TO:  SYNGENTA CROP PROTECTION, L.L.C.
         THROUGH LOUISIANA LONG ARM STATUTE:
         C/O THE CORPORATION TRUST COMPANY
         1209 ORANGE STREET
         WILMINGTON, DE  19801

JAN 3 0 2024

**YOU ARE HEREBY SUMMONED** to comply with the prayer of the attached PLAINTIFF'S FIRST SUPPLEMENTAL AND AMENDING AND REINSTATED PETITION FOR DAMAGES AND DEMAND FOR JURY TRIAL or file your answer thereto in writing, in the office of the Clerk of Court for the 18th Judicial District Court of the State of Louisiana, in and for the Parish of Iberville, situated at the Court House of said Parish within thirty(30) days after the filing in the record of the affidavit of the individual who either:

(a) mailed the process to the defendant, showing that it was enclosed in an envelope properly addressed to the defendant, with sufficient postage affixed, and the date it was deposited in the United States mail, to which shall be attached the return receipt of the defendant; or

(b) actually delivered the process to the defendant, showing the date and place, and manner of delivery, under penalty of default.

WITNESS, THE HONORABLE JUDGES OF SAID COURT, ON JANUARY 29, 2024

*Deputy Clerk of Court*
Hon. Amy M. Patin, Clerk of Court
18th JDC/Parish of Iberville
58050 Meriam Street, 1st Floor
P.O. Box 423
Plaquemine, LA 70765-0423

Attorney:

NICHOLAS R. ROCKFORTE

1901 KALISTE SALOOM ROAD

LAFAYETTE, LA 70508

PHONE: (337) 261-2617

FILED

2024 JAN 29  A 10: 08

IBERVILLE, LOUISIANA

[ ORIGINAL ]

A TRUE COPY
DATE

Deputy Clerk, Ex-Officio, Recorder, Iberville Parish, Louisiana

# LONG ARM CITATION
## CITATION PURSUANT TO THE PROVISIONS OF LSA-R.S. 13:3201 ET SEQ.

*DOROTHY DIANNE ROGERS KELLY*

*Versus*

*SYNGENTA CROP PROTECTION, L.L.C., ET AL*



*Case: 082988*
*Division: D*
*18th Judicial District Court*
*Parish of Iberville*
*State of Louisiana*

TO:  SYNGENTA CROP PROTECTION, L.L.C.
        THROUGH LOUISIANA LONG ARM STATUTE:
        C/O THE CORPORATION TRUST COMPANY
        1209 ORANGE STREET
        WILMINGTON, DE  19801

**YOU ARE HEREBY SUMMONED** to comply with the prayer of the attached PLAINTIFF'S FIRST SUPPLEMENTAL AND AMENDING AND REINSTATED PETITION FOR DAMAGES AND DEMAND FOR JURY TRIAL or file your answer thereto in writing, in the office of the Clerk of Court for the 18th Judicial District Court of the State of Louisiana, in and for the Parish of Iberville, situated at the Court House of said Parish within thirty(30) days after the filing in the record of the affidavit of the individual who either:

(a) mailed the process to the defendant, showing that it was enclosed in an envelope properly addressed to the defendant, with sufficient postage affixed, and the date it was deposited in the United States mail, to which shall be attached the return receipt of the defendant; or

(b) actually delivered the process to the defendant, showing the date and place, and manner of delivery, under penalty of default.

WITNESS, THE HONORABLE JUDGES OF SAID COURT, ON JANUARY 29, 2024

Deputy Clerk of Court
Hon. Amy M. Patin, Clerk of Court
18th JDC/Parish of Iberville
58050 Meriam Street, 1st Floor
P.O. Box 423
Plaquemine, LA 70765-0423

Attorney:

NICHOLAS R. ROCKFORTE

1901 KALISTE SALOOM ROAD

LAFAYETTE, LA 70508

PHONE: (337) 261-2617

FILED

2024 JAN 29  A 10: 08

BY CLERK OF _____
IBERVILLE, LOUISIANA
[ RETURN COPY ]

A TRUE COPY
DATE _____
_____, Recorder, Iberville Parish, Louisiana

| DOROTHY DIANNE ROGERS KELLY, MELISSA SAWYER, AND BOBBY DALE KELLY, INDIVIDUALLY AND ON BEHALF OF THE DECEASED BOBBY LAVELLE KELLY, AND DOROTHY DIANNE ROGERS KELLY AS THE PERSONAL REPRESENTATIVE ON BEHALF OF THE ESTATE OF BOBBY LAVELLE KELLY | 18TH JUDICIAL DISTRICT COURT<br><br>PARISH OF IBERVILLE<br><br>STATE OF LOUISIANA |
|---|---|
| VERSUS | |
| SYNGENTA CROP PROTECTION, LLC, CHEVRON U.S.A. INC., LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE AND LOUISIANA STATE UNIVERSITY CENTER FOR AGRICULTURAL SCIENCES AND RURAL DEVELOPMENT A/K/A LSU AGRICULTURAL CENTER THROUGH THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | CIVIL SUIT NO. C-82988 |

> Iberville
> **AMY MATIRNE PATIN**
> **BRANDY E. FOREMAN**
> Suit# C-C-82988
> E-Filed on: 1/26/24 01:50 PM
> Filed on: 1/26/24 02:29 PM
> # of Pages:57

## PLAINTIFFS' FIRST SUPPLEMENTAL AND AMENDING AND REINSTATED PETITION FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs Dorothy Dianne Rogers Kelly, Melissa Sawyer, and Bobby Dale Kelly, individually and on behalf of the deceased Bobby Lavelle Kelly, and Dorothy Dianne Rogers Kelly as personal representative of the estate of Bobby Lavelle Kelly, by undersigned counsel, hereby submits this First Supplemental and Amending and Reinstated Petition against the above-captioned Defendants for equitable relief, monetary restitution, and/or compensatory and punitive damages. This Petition replaces the previous petition in its entirety. Plaintiffs make the following allegations based upon personal knowledge, and upon information and belief, as well as their attorneys' investigative efforts, regarding Paraquat and its connection to Parkinson's disease.

### SUMMARY

1.      This is a products liability action against the researchers, designers, manufacturers, labelers, marketers, promoters, distributors, and sellers of Paraquat.

2.      Paraquat is a non-selective, "burn-down" herbicide that kills all forms of plant life. Paraquat is often used to kill weeds and prepare crops for harvest. Paraquat has been available in the United States since at least 1965 and is still commonly used today.

3.    Low-dose exposure to Paraquat causes neurological injuries that progress to become Parkinson's disease.

4.    The same biological processes that make Paraquat effective as an herbicide make it effective at damaging the part of the brain that makes the neurotransmitter needed for voluntary motor control. That damage is Parkinson's disease.

5.    Defendants are the researchers, designers, manufacturers, labelers, marketers, promoters, and distributors of Paraquat ("PRODUCTS" or "Paraquat"). Syngenta Crop Protection LLC is the successor to the original designers and manufactures of Paraquat. Chevron U.S.A. Inc. ("Chevron") is the successor to the original designers, formulators, and distributors of Paraquat in the United States, and had various other Paraquat-related businesses. Louisiana State University Center for Agricultural Sciences and Rural Development a/k/a LSU Agricultural Center ("LSU AgCenter") together with the Louisiana State University and Agricultural and Mechanical College ("LSU"), both sued through The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (collectively, "The LSU Defendants") were captive key opinion leaders of Chevron and Syngenta and instrumental in the testing, registration, marketing, promotion, and dissemination of incomplete and misleading information regarding Paraquat in Louisiana.

6.    Defendants worked in tandem to research, design, test, manufacture, label, market, promote, and distribute Paraquat, and to ensure that the causal link between Paraquat and Parkinson's disease remained hidden from the public, from Plaintiffs, and from the medical and scientific communities. Defendants are jointly and severally liable to Plaintiffs on all causes of action alleged herein.

7.    Defendants have known that Paraquat is unreasonably dangerous since before it first entered the stream of commerce in or before 1965. Defendants chose to conceal that information from the public and Plaintiff despite being fully aware of the exceptionally high risk that their misrepresentations would result in harm to Paraquat end-users.

8.    Plaintiff, Bobby Lavelle Kelly, (hereinafter "Plaintiff") was an end-user of Paraquat. He was among the intended users of Paraquat: farmers, agricultural workers, and others who came into contact with small amounts of Paraquat while Paraquat was being used to kill weeds and prepare crops for harvest, among other intended uses. As a result of his exposure to Paraquat, Plaintiff Bobby Lavelle Kelly suffered neurological injuries, including Parkinson's disease and

2

precursor ailments that progressed into Parkinson's disease. Bobby Lavelle Kelly passed away on January 26, 2023.

9.      Plaintiff Dorothy Dianne Rogers Kelly is the surviving spouse of Bobby Lavelle Kelly, an end-user of Paraquat. Dorothy Dianne Rogers Kelly brings a claim for loss of consortium, wrongful death, and survival damages. She is the personal representative of the estate of Bobby Lavelle Kelly.

10.     Plaintiff Melissa Sawyer is the surviving child of Bobby Lavelle Kelly, an end-user of Paraquat. Melissa Sawyer brings a claim for loss of consortium, wrongful death, and survival damages.

11.     Plaintiff Bobby Dale Kelly is the surviving child of Bobby Lavelle Kelly, an end-user of Paraquat. Bobby Dale Kelly brings a claim for loss of consortium, wrongful death, and survival damages. (Hereinafter, "Plaintiff" will refer to Bobby Lavelle Kelly, deceased, and "Plaintiffs" will refer to Dorothy Dianne Rogers Kelly, Melissa Sawyer, and Bobby Dale Kelly, individually and on behalf of the deceased Bobby Lavelle Kelly.)

12.     At all relevant times, it was reasonably foreseeable to Defendants that Paraquat would cause Plaintiff's injuries.

13.     Plaintiffs bring this action within one year of Plaintiff's passing. But, in any event, the expiration of any applicable statute of limitations is equitably tolled by reason of Defendants' fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

14.     Plaintiffs assert negligence and intentional theories of liability against Defendants. Plaintiffs pray for relief—including compensatory and exemplary damages—for injuries suffered as a result of Plaintiff Bobby Lavelle Kelly's exposure to Paraquat.

## JURISDICTION AND VENUE

15.     The 18th Judicial District Court ("JDC"), Parish of Iberville, has personal jurisdiction over Plaintiffs because Plaintiffs consent to the jurisdiction of the 18th JDC.

16.     The 18th JDC, Parish of Iberville and Louisiana state courts generally have jurisdiction over this action pursuant to the Louisiana Code of Civil Procedure Art. 2 and Louisiana Code of Civil Procedure Art. 6. Specifically, the 18th JDC, Parish of Iberville has personal jurisdiction over Defendants Syngenta and Chevron because, at all relevant times, Defendants regularly solicited and conducted business in Louisiana such that they can be said to have purposefully availed themselves of the privilege of conducting activities in Louisiana. Defendants

have each exploited the agricultural markets in Louisiana, done substantial business in Louisiana, and realized substantial profits as a result.

17.    In addition, 18th JDC, Parish of Iberville has personal jurisdiction over Defendants Syngenta and Chevron because they have transacted substantial business within Louisiana and with Louisiana businesses and residents and have caused harm in Louisiana as a result of the specific business activities complained of herein.

18.    The 18th JDC, Parish of Iberville, has jurisdiction over the LSU Defendants because they are domiciled in East Baton Rouge Parish, have satellite offices and campuses throughout Louisiana, and regularly conduct business throughout Louisiana. They are essentially at home in Louisiana, and 18th JDC, Parish of Iberville, possesses general jurisdiction over the LSU Defendants.

19.    Defendant Syngenta has purposefully availed itself of the privilege of conducting activities in Louisiana, including owning and operating manufacturing facilities in Louisiana, exploiting the Louisiana market for agricultural products, entering into contracts with Louisiana-domiciled corporations (including the LSU Defendants), and marketing and selling Paraquat to Louisiana distributors and end-users:

    a.    Syngenta designed, manufactured, tested, promoted, and distributed Paraquat in conjunction with Chevron and with LSU Defendants. This included exchanging data on toxicity and exposure, conducting regularly scheduled meetings to review available research relevant to the safety of Paraquat end-users, and developing marketing and public relations strategies to target Louisiana distributors of Paraquat, Louisiana end-users of Paraquat, and Louisiana state regulators.

    b.    Syngenta worked hand-in-hand with Chevron and with LSU Defendants to register Paraquat with the Louisiana Department of Agriculture and Forestry so that Paraquat could be sold in Louisiana.

    c.    Syngenta sold Paraquat in Louisiana both in conjunction with Chevron and separately.

    d.    Syngenta worked closely with the LSU Defendants for the specific purpose of promoting the use of Paraquat to end users in Louisiana, including by planning, promoting, and hosting field days for farmers and other end users for the specific purpose of promoting, popularizing, and selling Paraquat.

e.    Syngenta marketed Paraquat to end-users in Louisiana both in conjunction with Chevron and LSU Defendants and separately. This included ads and other promotional materials that depict farmers spraying Paraquat without wearing personal protective equipment, which were distributed in Louisiana.

f.    Plaintiff's exposures to Paraquat occurred in Louisiana, and Plaintiff's treatment for his resulting Parkinson's disease or precursor ailments occurred in Louisiana.

g.    At all relevant times, Syngenta—in tandem with as well as separately from Chevron—maintained active control of Paraquat production and sale to distributors and end-users in Louisiana.

h.    Defendant Syngenta owns and operates a manufacturing plant in St. Gabriel, Iberville Parish, Louisiana; employed Louisiana residents; and regularly solicited and transacted business in Louisiana and Iberville Parish.

i.    At their St. Gabriel Plant, Syngenta formulated and manufactured Paraquat and worked with LSU Defendants to test Paraquat at surrounding farms and research facilities, as well as at other farms and research facilities across Louisiana.

j.    Defendant Syngenta partnered with LSU Defendants, and upon information and belief with other Louisiana companies, to research best application methods for Paraquat, and to promote the use of Paraquat to Louisiana end-users, including testing Paraquat on farms owned and operated by the LSU Defendants within Louisiana as well as on farms owned and operated by other farmers within Louisiana.

k.    Syngenta worked closely with LSU Defendants to test Paraquat using test plots, which involves the use of private lands to test Paraquat applications. This served both a research and development function and a marketing one, as Syngenta supplied the Paraquat necessary to conduct the testing at no and/or reduced cost to farmers and aimed to convince the farmer-owners of the private land used to test Paraquat of its efficacy and grow a loyal customer base for Paraquat. These test plots are often strategically selected to be close to busy roads and highways and therefore visible to other farmers, as a promotional feature.

l.    Syngenta performs, hires others to perform, and funds or otherwise sponsors the testing of Paraquat in Louisiana.

m.    Defendant Syngenta has given LSU Defendants donations and entered into joint ventures with LSU Defendants as a part of an effort to strengthen Syngenta's brand in Louisiana.

20.    At all relevant times, Syngenta has been registered to do business in Louisiana as a foreign corporation.

21.    Syngenta's myriad contacts with Louisiana are more than random, isolated, or fortuitous; they are purposeful, continuous, and sufficiently related to Plaintiffs' allegations that Paraquat causes Parkinson's disease such that it would not offend traditional notions of fair play and substantial justice to maintain this suit against Syngenta in Louisiana. La. R.S.§ 13:3201.

22.    Defendant Chevron has purposefully availed itself of the privilege of conducting activities in Louisiana, including exploiting the Louisiana market for agricultural products, entering into contracts with Louisiana-domiciled corporations (including LSU Defendants), and marketing and selling Paraquat to Louisiana distributors and end-users:

a.    Chevron designed, manufactured, tested, promoted, and distributed Paraquat in conjunction with Syngenta and with LSU Defendants. This included exchanging data on toxicity and exposure, regularly scheduled meetings to review available research relevant to the safety of Paraquat end-users and developing marketing and public-relations strategies to target Louisiana end-users and Louisiana state regulators.

b.    Chevron worked hand-in-hand with Syngenta and with LSU Defendants to register Paraquat with the Louisiana Department of Agriculture and Forestry so that Paraquat could be sold in Louisiana.

c.    Chevron also worked hand-in-hand with LSU Defendants to register Paraquat with the appropriate regulatory agencies in other states, including but not limited to Arkansas, Texas, and Hawaii.

d.    Chevron sold Paraquat in Louisiana both in conjunction with Syngenta and separately.

e.    Chevron marketed Paraquat to end-users in Louisiana both in conjunction with Syngenta and LSU Defendants and separately.

f.    Chevron worked closely with the LSU Defendants for the specific purpose of promoting the use of Paraquat to end users in Louisiana, including by planning,

promoting, and hosting field days for farmers and other end users for the specific purpose of promoting, popularizing, and selling Paraquat.

g.      Chevron too worked closely with LSU Defendants to test Paraquat in St. Gabriel and at surrounding farms and research facilities, as well as at other farms and research facilities across Louisiana.

h.      Chevron worked closely with LSU Defendants to test Paraquat using test plots, which involves the use of private lands to test Paraquat applications. This served both a research and development function and a marketing one, as Chevron supplied the Paraquat necessary to conduct the testing at no and/or reduced cost to farmers and aimed to convince the farmer-owners of the private land used to test Paraquat of its efficacy and grow a loyal customer base for Paraquat. These test plots are often strategically selected to be close to busy roads and highways and therefore visible to other farmers as a promotional feature.

i.      Plaintiff's exposures to Paraquat occurred wholly in Louisiana, and Plaintiff's diagnosis of and treatment for his resulting Parkinson's disease occurred wholly in Louisiana.

j.      At all relevant times, Chevron—in tandem with as well as separately from Syngenta—maintained active control of Paraquat production and sale to distributors and end-users in Louisiana.

k.      Chevron performed, hired others to perform, and funded or otherwise sponsored the testing of Paraquat in Louisiana.

l.      Defendant Chevron partnered with Louisiana companies, including LSU Defendants, to research best application methods for Paraquat, and to promote the use of Paraquat to Louisiana end-users, including testing Paraquat on farms owned and operated by the LSU Defendants within Louisiana as well as on farms owned and operated by others within Louisiana. This research took place in various locations throughout the State, including in St. Gabriel, Iberville Parish, Louisiana.

23.     At all relevant times, Chevron has been registered to do business in Louisiana as a foreign corporation.

24.     Chevron's myriad contacts with Louisiana are more than random, isolated, or fortuitous; they are purposeful, continuous, and sufficiently related to Plaintiffs allegations that

7

Paraquat causes Parkinson's disease such that it would not offend traditional notions of fair play and substantial justice to maintain this suit against Chevron in Louisiana. La. R.S.§ 13:3201.

25.    Plaintiff, Dorothy Dianne Rogers Kelly, is a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241, and is domiciled in Union Parish. Plaintiff asserts the present wrongful death and survival actions pursuant to La. C.C. Art. 2315.1, La. C.C. Art. 2315.2, and La. C.C.P. Art. 2315, et seq.

26.    Plaintiff, Melissa Sawyer, is a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241, and is domiciled in Union Parish. Plaintiff asserts the present wrongful death and survival actions pursuant to La. C.C. Art. 2315.1, La. C.C. Art. 2315.2, and La. C.C.P. Art. 2315, et seq.

27.    Plaintiff, Bobby Dale Kelly, is a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241, and is domiciled in Union Parish. Plaintiff asserts the present wrongful death and survival actions pursuant to La. C.C. Art. 2315.1, La. C.C. Art. 2315.2, and La. C.C.P. Art. 2315, et seq.

28.    Venue is proper in Iberville Parish, Louisiana as to Syngenta under Louisiana Code of Civil Procedure Art. 42 because Syngenta Crop Protection, LLC has designated its St. Gabriel Plant in St. Gabriel, Iberville Parish, Louisiana as its Principal Business Establishment in Louisiana in its application to do business in the state. Defendant Syngenta also manufactured Paraquat at this facility in Iberville Parish.

29.    Venue is proper in Iberville Parish, Louisiana as to the LSU Defendants under LA Rev. Stat. § 13:5104 because all suits filed against agencies of the State of Louisiana (including the LSU Defendants) are proper in the parish in which the cause of action arises. The operative facts which support Plaintiffs' entitlement to recovery as further detailed herein substantially arose in Iberville Parish and were not merely administrative or ministerial in nature.

30.    Venue is proper in Iberville Parish, Louisiana as to Chevron under Louisiana Code of Civil Procedure Art. 73 as Plaintiffs allege that Defendants are joint or solidary obligors and venue is proper in Iberville Parish under Art. 42 as to Syngenta and under LA Rev. Stat. § 13:5104. Therefore, venue is proper on all defendants.

31.    Plaintiffs have timely-filed this action within one year of discovering Plaintiffs' causes of action as defined and required by La. Civ. Code Ann. art. 3492, because Plaintiff was found to have Parkinson's Disease by a neurologist on September 8, 2021. Further, the injury or

8

damage suffered by Plaintiffs was not immediately apparent, and Plaintiffs bring this action within one year of becoming aware of the connection between Plaintiff's condition and the Defendants' tortious actions. *Watters v. Department of Social Services*, App. 4 Cir.2012, 102 So.3d 118, 2011-1174 (La.App. 4 Cir. 3/14/12); *Guidry v. Aventis Pharmaceuticals, Inc.*, 418 F.Supp.2d 835 (M. D. La. 2006); *Hoerner v. Wesley-Jensen*, 684 So. 2d 508 (La. App. 4 Cir. 1996). Moreover, to the extent that there was any delay in Plaintiffs' discovery of the connection between their injuries and the tortious conduct of Defendants, this is an artefact of the Defendants, as Defendants fraudulently concealed facts that delayed Plaintiffs' ability to know their injuries and their cause.

## PLAINTIFFS

### Bobby Lavelle Kelly, Deceased

32.     Plaintiff was a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241.

33.     Plaintiff was domiciled in and perished in Union Parish, Louisiana.

34.     Plaintiff, through the personal representative and survivors of his estate, alleges wrongful death as he was injured and developed Parkinson's disease as a result of exposure to Paraquat that occurred over an 18-year period from 1988-2005 and the tortious actions of Defendants, further detailed herein.

### Dorothy Dianne Rogers Kelly

35.     Plaintiff is a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241.

36.     Plaintiff is domiciled in Union Parish, Louisiana.

37.     Plaintiff is the surviving spouse of Bobby Lavelle Kelly, deceased.

38.     Plaintiff is the personal representative of the estate of Bobby Lavelle Kelly.

39.     Plaintiff alleges she has suffered a loss of consortium as a result of her husband's injury and development of Parkinson's disease as a result of exposure to Paraquat and the tortious actions of Defendants, further detailed herein.

### Melissa Sawyer

40.     Plaintiff is a natural person of the full age of majority residing at 200 Pinewoods Rd., Farmerville, Louisiana 71241.

41.     Plaintiff is domiciled in Union Parish, Louisiana.

42.     Plaintiff is the surviving child of Bobby Lavelle Kelly, deceased.

9

43.     Plaintiff alleges she has suffered a loss of consortium as a result of her father's injury and development of Parkinson's disease as a result of exposure to Paraquat and the tortious actions of Defendants, further detailed herein.

***Bobby Dale Kelly***

44.     Plaintiff is a natural person of the full age of majority residing at 298 Cecil Doyle Rd., Deridder, Louisiana 70634.

45.     Plaintiff is domiciled in Beauregard Parish, Louisiana.

46.     Plaintiff is the surviving child of Bobby Lavelle Kelly, deceased.

47.     Plaintiff alleges he has suffered a loss of consortium as a result of his father's injury and development of Parkinson's disease as a result of exposure to Paraquat and the tortious actions of Defendants, further detailed herein.

## DEFENDANTS

*Syngenta*

48.     Paraquat was first designed, manufactured, patented, and distributed by a British entity called Imperial Chemical Industries and its affiliates. Through a series of mergers and acquisitions, Imperial Chemical Industries and its affiliates' successors are Defendants Syngenta AG and Syngenta Crop Protection LLC. This Complaint therefore ascribes Imperial Chemical Industries' and its affiliates' and successors' actions, as well as the actions of other companies to which Syngenta is a successor, to Syngenta.

*Chevron*

49.     Syngenta made a deal to partner with the California Chemical Company, Ortho Division to design, manufacture, and distribute Paraquat in the United States. Through a series of mergers and acquisitions, California Chemical Company and its successors' and affiliates' (including Chevron Chemical Company) ultimate successor is Defendant Chevron U.S.A. Inc. This Complaint therefore ascribes California Chemical Company's actions, as well as the actions of its affiliates and other companies to which Chevron is a successor, to Chevron. Chevron also manufactured other products recommended for use with Paraquat.

50.     Chevron is incorporated in Pennsylvania and its principal place of business is in San Ramon, California.

10

***LSU Defendants***

51.    The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is an entity domiciled in East Baton Rouge Parish Louisiana.

52.    The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is the legal entity responsible for both Louisiana State University and Agricultural and Mechanical College and the Louisiana State University Center for Agricultural Sciences and Rural Development a/k/a Louisiana State University Cooperative Extension Service a/k/a Louisiana State University Agricultural Center ("LSU AgCenter").

53.    The Louisiana State University system was originally established as a land-grant university, meaning that the public land was donated to support LSU, which would be established as a college that would emphasize agriculture and mechanical arts. Hence, LSU Agricultural and Mechanical College.

54.    Louisiana State University Center for Agricultural Sciences and Rural Development a/k/a Louisiana State University Cooperative Extension Service a/k/a Louisiana State University Agricultural Center ("LSU AgCenter") is an institution within the Louisiana State University system.

55.    The LSU AgCenter's research stations were originally established and funded by the 1887 Hatch Act.

56.    The LSU AgCenter's Cooperative Extension Service was originally established and funded through the Smith-Lever Act of 1914. This statute states that, "cooperative agricultural extension work *shall* consist of the giving of instruction and practical demonstrations in agriculture and home economics to persons not attending or resident in said colleges in the several communities and imparting to such persons information on said subjects through field demonstrations, publications, and otherwise." United States Statutes at Large, 63 Cong. Ch. 79, May 8, 1914, 38 Stat. 372. (emphasis supplied).

57.    Consistent with the LSU AgCenter's statutory mandate, according to LSU AgCenter's website, faculty of LSU AgCenter work with LSU faculty to deliver "research-based information to Louisiana citizens." The LSU AgCenter has offices in every parish, 15 research stations across the state and 14 academic/research departments on the LSU campus. LSU Defendants also work with private farmers to test and market agricultural products on test plots throughout the state of Louisiana, including in Iberville Parish.

11

58.     Together, the LSU Defendants conducted research on Paraquat and its uses and helped promote Paraquat as safe and effective to Louisiana state regulators and Louisiana consumers and to conceal and obscure its connection to Parkinson's Disease, despite conducting no testing into Paraquat's safety and having actual and/or constructive knowledge of Paraquat's toxic effects on human health.

## TERMS

59.     As used in this Complaint, "Paraquat" refers to all formulations of products containing the active ingredient Paraquat, including, but not limited to, Gramoxone, or any other formulation containing Paraquat.

60.     As used in this Complaint, "formulator" refers to a company that combines technical Paraquat or other essential Paraquat chemical ingredients with other chemicals to create a product that is sold to end-users. As used here, all such products have an active ingredient of Paraquat.

61.     As used in this Complaint, a "surfactant" is a chemical added to Paraquat by an end-user prior to using Paraquat. Surfactants help Paraquat stick to the surface of weed leaves and accelerate the movement of Paraquat through the epidermis of plants, into the inside of plants where it cannot wash off and where it comes into contact with plant cells.

## PRIOR LITIGATION

62.     Several prior cases have alleged that low-dose Paraquat exposure causes Parkinson's disease in Paraquat end-users.

63.     The earliest prior litigation was the *Hoffman* case, venued in Illinois state court. *Hoffman* named Syngenta, Chevron, and a local Illinois distributor as defendants. *Hoffman* settled in 2021 on the eve of trial. The vast majority of the discovery from *Hoffman* has been made available to Plaintiffs pursuant to *In Re: Paraquat Products Liability Litigation v. Syngenta Crop Protection, LLC et al*, Case #3:21-md-03004-NJR.

## THE ALLEGATIONS

### Discovery and Design of Paraquat

64.     Paraquat is a man-made chemical formulation; it does not occur naturally.

65.     Paraquat was first discovered in the 1880s but, at that time, its herbicidal properties were not known.

66.     In the 1930s, organic chemists discovered "free radicals"—unstable molecules that damaged human cells, including the DNA in those cells. Free radicals can occur naturally or be

caused by external stressors or substances. Free-radical molecules come to possess an uneven number of electrons. That uneven number allows them to easily react with other molecules through a process called "oxidation." Scientists discovered that a cascade of these oxidation reactions were toxic to human cells because they damaged the cells, interrupted their normal operation, and corrupted the cells' DNA. These cascades of oxidation reactions are sometimes called "redox cycling." And the net (toxic) effects of redox cycling are sometimes referred to as "oxidative stress."

67.     Prior to the 1950s, the same oxidative stress that was known to be toxic to human and animal cells was found to be toxic to plant cells.

68.     In or about 1955, scientists at Syngenta discovered that Paraquat caused redox cycling and oxidative stress. Syngenta scientists discovered that Paraquat cations would continuously and perpetually lose and then regain an oxygen ion. They realized that there was no natural stoppage for this redox cycling; it would go on and on in perpetuity, causing significant oxidative stress.

69.     Syngenta scientists discovered that this redox cycling would result in oxidative stress that would be toxic to plant cells and interfere with a plant's ability to conduct photosynthesis. Paraquat-induced redox cycling and oxidative stress, the Syngenta scientists concluded, made Paraquat effective as an herbicide.

70.     Paraquat was effective as an herbicide because it induced redox cycling and caused oxidative stress in plants in the same way that the free-radical literature had documented redox cycling and oxidative stress disrupted the cellular function and damaged the cellular DNA of human cells.

71.     However, Paraquat was not effective on its own. Without a surfactant, Paraquat would run off the leaves of plants instead of penetrating into the plant's cells where redox cycling could cause oxidative stress and disrupt photosynthesis. Syngenta scientists would test the many surfactants available on the market to determine their compatibility with Paraquat. Chevron was one company that manufactured surfactants that could be used with Paraquat. Generally, these surfactants were non-ionic and readily available in the United States.

72.     Syngenta obtained various U.S. and U.K. patent protections for Paraquat in or about 1960 and 1961 and began selling Paraquat internationally in 1962.

73.     Generally, Syngenta would manufacture what it called "technical Paraquat," an essential form of the active ingredient that had to be formulated further into a final, sale-ready product. Syngenta would partner with other companies to formulate and distribute Paraquat.

*Partnership with Chevron*

74.     At roughly the same time that Syngenta obtained patent protection for Paraquat, Chevron was looking to increase its presence in the agricultural chemical market. Chevron already manufactured several agricultural chemicals, including non-ionic surfactants that could help herbicides penetrate a plant's dermis and attack a plant's cells. But Chevron sought to expand into herbicides and pesticides, which are sometimes referred to as "crop protection" business lines.

75.     As part of that expansion, on or about May 19, 1960, Chevron entered into an agreement with Syngenta that would allow Chevron to evaluate Paraquat for potential sale in the United States. Pursuant to that agreement, Syngenta supplied Chevron with information concerning Syngenta's Paraquat formulations, their herbicidal properties, and data relating to safety and exposure risk.

76.     Chevron reviewed these data and conducted extensive market research to determine the potential demand for Paraquat in the United States. After several years of evaluation and negotiation, Chevron and Syngenta decided to enter a partnership.

77.     On or about May 4, 1964, Syngenta entered into a licensing agreement with the Chevron, whereby Chevron would act as the exclusive formulator and distributor of Paraquat in the United States.

78.     The agreement also mandated that Syngenta and Chevron share information concerning the formulation, use, and sale of Paraquat, and permitted that information to be shared with companies Syngenta and Chevron contracted with to formulate or sell Paraquat.

79.     Under the agreement, Syngenta would manufacture technical Paraquat and Chevron, along with other companies Syngenta and Chevron contracted with, would formulate the technical Paraquat into the use-ready Paraquat that Chevron would sell to distributors, and that would ultimately be purchased and used by an end-user.

*Paraquat Was Known to be Unreasonably Dangerous*

80.     Before Paraquat was ever sold in the United States, both Syngenta and Chevron were aware that Paraquat was unreasonably dangerous.

81.    By 1958, internal Syngenta research reports opined that Paraquat was at least moderately toxic to humans, and that the main area of the human body affected was the central nervous system. Those research documents proposed further evaluation of Paraquat's toxicity before placing it into the stream of commerce. This research was either not done or its results were suppressed.

82.    By 1960, Syngenta was aware that Paraquat would undergo redox cycling and could accumulate in mammalian tissues.

83.    Similarly, by at least 1963, internal Chevron documents reveal that Paraquat was potentially hazardous to human health, and that insufficient research had been done to evaluate its potential neurotoxic effects.

84.    Similarly, by at least 1970, the LSU Defendants were aware of that even small amounts of Paraquat drift could pose possible oral and dermal hazard to people. Nonetheless, the LSU Defendants continued to aid Chevron in expanding the registration of Paraquat in Louisiana and other states; in promoting the usage of Paraquat among Louisiana farmers; and in testing the efficacy of Paraquat for pre-plant and burn-down applications without conducting any testing as to its potential neurotoxic effects, despite the LSU Defendants' awareness of the potential hazards Paraquat posed to human health.

85.    Further, following the start of global sales of Paraquat in 1962, Syngenta observed that workers involved in its manufacture of Paraquat were experiencing nose bleeds and other symptoms consistent with toxic exposure. As a result, Syngenta quickly changed its manufacturing processes, creating a so-called "closed system" where engineering controls would prevent Syngenta employees from ever coming into contact with Paraquat.

86.    Syngenta shared this internal research data with Chevron as part of their pre-deal diligence. These data demonstrated that Paraquat was highly toxic and had the potential to seriously injure or kill humans exposed to highly concentrated doses of the herbicide. The data also indicated that low-dose exposure had the potential to affect the human central nervous system.

87.    Nonetheless, after consummating their partnership, Syngenta and Chevron embarked on a full-scale joint operation to manufacture and sell Paraquat in the United States while hiding the risk of low-dose Paraquat exposure, with the help of key opinion leaders like LSU Defendants.

*Syngenta and Chevron Place Paraquat on the Market with Help from LSU Defendants*

88.    Prior to the first U.S. sale of Paraquat in 1965, Syngenta and Chevron had to register Paraquat with various state and federal authorities, including the Louisiana Department of Agriculture & Forestry. Registration required Syngenta and Chevron to agree on a formulation of the product.

89.    Aware that Paraquat was highly toxic to humans, Syngenta and Chevron jointly decided to minimize the appearance of toxicity. Both companies were aware—through internal research data as well as their experience designing and selling surfactants—that surfactants would dramatically increase the toxicity of Paraquat.

90.    For instance, internal Syngenta research documents show that surfactants were found to speed Paraquat's penetration into animal cells, increase the concentration of Paraquat in animal cells, and increase the bioavailability—that is, the proportion a substance that is able to have an active effect on the body—of Paraquat. These research documents conclude that the inclusion of surfactants in Paraquat formulations is likely to increase the Paraquat's toxicity.

91.    On information and belief, these data—or summaries of them—were shared with Chevron pursuant to their partnership agreement. Chevron and Syngenta held regular meetings to discuss (among other things) such topics.

92.    To mask Paraquat's toxicity, Syngenta and Chevron jointly decided to sell Paraquat in the United States without a surfactant. The implications of that decision were twofold.

93.    First, Syngenta and Chevron jointly submitted scientific studies and reports in support of their applications to state and federal regulators that showed lower levels of toxicity than what would actually be experienced by end-users of Paraquat.

94.    Second, Syngenta and Chevron knew that requiring end-users to mix Paraquat with a surfactant before using it would dramatically increase the risk of low-dose Paraquat exposure. Internal company documents from both Syngenta and Chevron commented upon the increased risk that end-users would come into contact with Paraquat while mixing the herbicide with surfactant or cleaning equipment used in the mixing process.

95.    Meanwhile, Syngenta decided to sell Paraquat pre-mixed with surfactant in certain markets outside of the United States.

96.    Paraquat was registered by state and federal authorities using the Syngenta-produced, Chevron-submitted data that masked the risks of human exposure. LSU Defendants

16

wrote letters of support for Paraquat to be registered and to increase its registered uses in at least four states, including in Louisiana, despite the fact that the supporting data masked the risks of human exposure and harm.

97.    Syngenta and Chevron began manufacturing, formulating, and selling Paraquat in the United States (including in Louisiana) pursuant to their partnership agreement and without a pre-mixed surfactant in or about 1965.

98.    LSU Defendants were a central part of getting Paraquat registered for use in Louisiana and also for expanding the designated uses for Paraquat on Louisiana state labels, as well as in other states and worked hand in hand with Syngenta and Chevron to conduct research and write letters of support of registration and later expanded use of Paraquat to various state regulators.

99.    Several of those products were accompanied by an instruction to use a particular surfactant: X-77 Spreader (sometimes called Ortho X-77). X-77 was designed and manufactured by Chevron and licensed to multiple other chemical companies, for manufacture and/or distribution.

100.    LSU Defendants worked with Syngenta and Chevron to test which of various surfactants in Louisiana in combination with Paraquat was most effective at triggering the oxidation process and leads to maximum cell and plant death. These studies formed the basis for state registration applications as well as promotional advertisements.

101.    Upon information and belief, despite active knowledge that the addition of surfactants to Paraquat leads to maximum cell and plant death, and therefore poses greater harm to human health, LSU Defendants chose to test only the efficacy of various surfactants at killing foliage and not on human health. LSU Defendants then promoted Paraquat for use with surfactants, without warning of the increased risk to human health.

102.    Chevron produced ads and other promotional materials that referred to X-77 as more efficient and economical when used with Paraquat and recommended that end-users mix Paraquat with X-77 in particular.

103.    In lockstep with Chevron, its partner and benefactor, LSU Defendants too put out promotional field guides that encouraged the use of various oils or surfactants with Paraquat to maximize its efficiency and economic value. None of these promotional field guides warned of the increased risk to human health.

17

*Syngenta and Chevron Create Nationwide Distribution Model*

104.    As the sole U.S. formulator and distributor of Paraquat, Chevron lacked capacity to make all of the Paraquat needed to satisfy the increasing demand for the herbicide in Louisiana and throughout the United States.

105.    To help alleviate the strain, with Syngenta's knowledge and authorization per the companies' partnership agreement, Chevron began to contract with third-party companies to formulate technical Paraquat received from Syngenta into Paraquat ready for sale to end-users and to perform other manufacturing tasks like bottling the consumer-ready Paraquat received from formulators.

106.    As part of this contract, third-party companies received data and documentation from Chevron, including a formulator handbook that described the technical specifications of Paraquat including its mode of action (i.e., redox cycling and oxidative stress), and prescribed the methods and manner for formulating consumer-ready Paraquat.

107.    Chevron also contracted with third parties to bottle Paraquat received from other formulators. This involved shipping large containers of consumer-ready Paraquat to facilities for bottling into the final consumer-ready packaging and affixing the relevant labels.

108.    Consumer-ready Paraquat was shipped throughout the United States, including in Louisiana, sometimes directly to local distributors like farm collectives, supply stores, or agricultural organizations, and sometimes to mid-market wholesalers.

109.    Chevron and Syngenta also maintained a large network of sales personnel tasked with selling Paraquat to end-users. Chevron also embarked, with the LSU Defendants' assistance and with Syngenta's knowledge and approval, on aggressive marketing campaigns to promote Paraquat as the key to so-called "no-till" farming. Chevron also utilized the large sales networks of distributor sales personnel to regionally promote Paraquat in Louisiana and elsewhere.

110.    These marketing efforts also included co-opting numerous "thought leaders" throughout Louisiana and the United States to encourage end-users to adopt aggressive Paraquat use. These thought leaders included middle-market wholesalers, agricultural extension services connected with major universities, agricultural colleges, and academic researchers who often had name recognition in the agricultural community such as LSU and LSU AgCenter.

111.    These marketing efforts also included the production and distribution (in Louisiana and elsewhere) of ads and leaflets and official "Louisiana's Suggested Chemical Weed Control

Guide[s]" extolling the benefits of Paraquat. Some of this material was produced by LSU Defendants and/or used the LSU and/or LSU AgCenter logo. In many of these ads and leaflets, farmers are depicted using Paraquat without any personal protective equipment—they are not wearing masks or gloves, not utilizing respirators; they are wearing everyday work clothes while mixing or spraying Paraquat. These ads and leaflets promoted the sale of Paraquat but failed to warn end-users of Paraquat about the toxicity and dangerous characteristics of human exposure to Paraquat.

112.    As another example, in the 1980s, Chevron was interested in exploring the application of paraquat plus oil for cotton harvest aid but was concerned that oil might enhance the penetration of Paraquat through the skin. Upon information and belief, although these concerns were shared with LSU Defendants, they nonetheless not only agreed to be part of the efficacy testing of a paraquat plus oil combination, but later were a key part of its promotion. Multiple LSU professors are quoted in articles about paraquat plus oil solutions for applications. In these articles, employees of the LSU Defendants are buoyant about the cost-cutting abilities of a paraquat plus oil solution for applications but make no mention of the fact that adding oil to Paraquat can multiply the hazards of dermal exposure to Paraquat nor do they suggest that additional precautions be taken when using paraquat plus oil solutions for applicators or tractors like Plaintiff. These articles appeared alongside photographs of farmers standing next to their tractors without any protective equipment.

### Sales of Paraquat Mushroom as Evidence of Human Toxicity Mounts

113.    Syngenta and Chevron's aggressive marketing efforts had their desired effect—shortly after sale of Paraquat began in the United States, it became a blockbuster.

114.    Many end-users purchased Paraquat from local farm collectives, supply stores, or agricultural organizations. And while, starting in the 1970s, Paraquat was technically a "restricted-use" pesticide—meaning that it was only supposed to be sold to licensed applicators who had received some basic safety training and passed a short exam—many local distributors sold to end-users (whom the local distributors had often known for years) who were not licensed applicators. In fact, many local distributors did not even mention the applicator requirement to purchasers of Paraquat, to the extent they knew of it themselves. And Syngenta and Chevron undertook no meaningful effort to ensure that only licensed applicators could acquire Paraquat. Profits were too high.

115.    While the sales of Paraquat in Louisiana and nationwide mushroomed, evidence of the herbicide's toxicity to humans grew further.

116.    Beginning in the mid-to-late 1960s, just a few years after Paraquat came on the market, several acute exposure incidents became known to Syngenta and Chevron. In these incidents, an end-user would accidentally ingest or otherwise be exposed to a highly-concentrated dose of Paraquat. These incidents were almost always fatal—the victim would succumb to acute trauma to oxygen-rich organs, usually within a few days of exposure.

117.    These acute-exposure incidents often resulted in an autopsy of the victim, the results of which were supplied to Syngenta and Chevron. These autopsy results repeatedly showed detectable amounts of Paraquat in the victim's brain, as well as other oxygen-rich organs like the lungs.

118.    Syngenta received similar autopsy results from outside the United States, which again showed that Paraquat was crossing the blood-brain barrier and entering the human brain.

119.    These external reports were confirmed by internal research available to both Syngenta and Chevron, and which on information and belief they shared with research, testing, and marketing partners, like the LSU Defendants.

120.    In the face of mounting deaths from Paraquat poisoning, Syngenta was nonetheless resistant to updating its labeling to reflect a skull and crossbones out of fear that it would hurt their bottom line. And Defendants never sought to include any language on the Paraquat labeling related to potential neurological injury.

121.    In 1969, Syngenta conducted (and shared with Chevron) a study that administered small amounts of Paraquat to lab animals via dermal exposure, oral exposure, and by injection into the abdomen. The study detected Paraquat in the exposed lab animals' brains, leading to the conclusion that Paraquat could enter the brain and cause neurotoxicity.

122.    According to contemporary newspaper reporting at the time, by at least 1970, LSU Defendants were aware of the potential toxic effects of paraquat to humans via dermal, oral, and inhalation exposure. In that same article, the head of Chevron's manager of research and development defended the absence of a skull and crossbones poison label on Paraquat saying that Paraquat was not in the category "requiring such poison labelling."

123.    Further research conducted in 1974 by Syngenta (and shared with Chevron) revealed that Paraquat could pass through the blood-brain barrier by active transport. This means

that instead of diffusing passively across the blood-brain barrier, Paraquat was actively transported by the body across the blood-brain barrier. Thus, Paraquat in the blood would ultimately end up in the brain.

124.    Additionally, at about the same time, research available in the public domain and known to Syngenta and Chevron, demonstrated that inhaled chemicals could pass directly into the brain via the olfactory bulb. This research showed that the olfactory bulb is not protected by the blood-brain barrier. Thus, Paraquat inhaled by an end-user can enter the brain directly through the olfactory bulb.

125.    At about the same time, in 1969, Syngenta scientists analyzing Paraquat concluded that low-dose exposure to the herbicide was likely to cause immediate neurotoxic damage, but that damage was unlikely to be detected until later. In other words, Paraquat was latently neurotoxic, Syngenta concluded. Chevron was made aware of these results and conclusions. Upon information and belief, it is likely that the LSU Defendants were as well. Despite state regulators asking Chevron for "everything they had" on Paraquat, upon information and belief, that information was not shared with state regulators.

126.    At the same time that Syngenta and Chevron knew that Paraquat in the blood could get into the brain (or enter the brain directly via the olfactory bulb) and cause damage that would not be discovered until later, they knew that end-users were being exposed to Paraquat such that it entered their bloodstream.

127.    In 1969, a Syngenta scientist published the results of field studies conducted in Malaysia that attempted to measure the real-world Paraquat exposure of a Paraquat end-user. The study followed several end-users as they mixed and sprayed Paraquat for agricultural purposes. The Syngenta researcher observed that workers generally did not wear protective equipment (and that none was supplied where they were working). Following Paraquat use, the researcher detected Paraquat in study participants' urine. Though the researcher did not analyze participants' blood, the fact that Paraquat was detectable in the participants' urine meant that it had been processed through participants' cardiopulmonary system and was in participants' blood.

128.    The results of this study were shared with or available to Chevron.

129.    Later, in or about 1980, Syngenta and Chevron jointly conducted a study of agricultural working conditions that concluded that workers often came into contact with Paraquat

by touching equipment (including spraying and mixing equipment) contaminated with Paraquat with their bare hands.

130.    LSU Defendants, especially the LSU AgCenter, were acutely aware that farmers and other end-users of Paraquat in Louisiana, such as Plaintiff, were mixing, loading, and spraying Paraquat without adequate—and often without any—protective equipment through their direct work with farmers in Louisiana. Despite representing to the public that they had directed "county agents" to be "extremely careful" with Paraquat, upon information and belief, LSU Defendants did not require farmers with whom they worked on test plots to wear adequate protective equipment and continued to disseminate Paraquat promotional materials depicting farmers without protective equipment.

131.    By the beginning of the 1980s, Syngenta and Chevron were aware that end-users were commonly being exposed to low doses of Paraquat, which was entering their blood and crossing over into their brains (or entering their brains directly via the olfactory bulb) and causing damage that would not be detected until later.

132.    Syngenta and Chevron were aware through field studies of the possibility of Paraquat to enter agricultural workers blood streams even if they were using protective equipment.

133.    Syngenta and Chevron were aware through field studies that agricultural workers often did not follow the product labeling, necessitating additional precautions to keep them safe.

### *Paraquat Becomes a Lab Favorite for Inducing Parkinson's*

134.    In 1982, after Syngenta and Chevron and their contractors and agents were aware that Paraquat was latently neurotoxic in end-users, the scientific community became aware of the connection between Paraquat and Parkinson's disease.

135.    That year, a group of heroin users in California suddenly began exhibiting symptoms of advance-stage Parkinson's disease.

136.    Researchers determined that the heroin users had injected themselves with a chemical called MPTP as part of a botched attempt to get high. This discovery was a breakthrough in Parkinson's disease research because it allowed researchers to simulate Parkinson's in lab animals using MPTP.

137.    Almost immediately, scientists began turning to Paraquat because it was widely available and, chemically, it is almost identical to MPTP. Starting in the 1980s and continuing to today, researchers use Paraquat exposure to induce Parkinson's disease in lab animals.

22

138. The reason Paraquat induces Parkinson's disease is that its redox cycling results in oxidative stress in the portion of the brain responsible for generating dopamine, the neurotransmitter that controls voluntary movement. This oxidative stress interferes with dopamine production and results in Parkinson's disease.

139. Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system—the part of the central nervous system that controls movement.

140. The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

141. Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

142. Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

143. There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects, the longer they are used.

144. When Paraquat enters the body, it enters the brain and causes selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

145. Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

146. The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

23

147.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

148.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

149.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

150.    Scientists seeking to study Parkinson's disease use Paraquat to create oxidative stress because of "redox properties" that are inherent in Paraquat's chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

151.    The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life-with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

152.    Syngenta and Chevron knew that Paraquat was neurotoxic, likely to enter the brains of end-users, and could cause Parkinson's disease in particular. LSU Defendants knew or should have known that Paraquat was neurotoxic, likely to enter the brain, and cause Parkinson's. LSU Defendants willfully or negligently disregarded scientific data showing the same.

### Chevron Becomes Uneasy and Partially Exits the Paraquat Market

153.    Syngenta and Chevron's reaction to the growing scientific literature linking Paraquat and Parkinson's was not to amend the label, warn their customers, or otherwise take any precautions. Instead, they claimed publicly in ads, leaflets, and through sales personnel that no link existed.

154. Despite their strong public statements to the contrary, worries grew within Chevron that Paraquat was neurotoxic.

155. The risks Chevron perceived were not to its loyal customers and end-users, however. Instead, Chevron worried that the labels it had lobbied for with state and federal regulators would be deemed insufficient, which would cast aspersions on the company's credibility with regulators. And Chevron worried that it would be subject to mass tort liability for the latent injuries Paraquat was causing to end-users—the next asbestos, Chevron personnel fretted internally.

156. But still, Chevron did nothing to warn the public or to alter its sales materials, which continued to depict farmers mixing and spraying Paraquat without wearing any protective equipment.

157. Meanwhile, Syngenta appeared to show no such compunctions. Instead of worrying about being the next asbestos, Syngenta (consistent with its partnership agreement with Chevron) began to sell Paraquat in the United States independently of Chevron in or about 1983.

158. Chevron and Syngenta's partnership agreement was due to terminate in 1986 absent a renegotiation and renewal. Despite their worries about the neurotoxicity of Paraquat, Chevron engaged in multiple rounds of detailed negotiations with Syngenta with a view to securing an extension to their partnership.

159. Ultimately, no such agreement was reached, and Chevron agreed to stop formulating and distributing Paraquat in or about 1986. However, Chevron still had a huge quantity of consumer-ready Paraquat in its possession. Some of that surplus was sold back to Syngenta, but some remained in Chevron's possession and, in addition to other Chevron-formulated Paraquat, was ultimately sold to distributors and end-users as late as approximately the mid-1990s.

160. Part of Chevron's calculus in departing the Paraquat business was economic. In 1976, glyphosate had become available as another so-called "burn down" herbicide. Like Paraquat, glyphosate (which goes by the trade name Roundup) will kill just about any type of plant it comes into contact with. However, glyphosate is not as toxic in highly-concentrated doses and was perceived by many in agriculture as safer than Paraquat. Glyphosate is also sold pre-mixed with surfactant, making it cheaper and more convenient for end-users, who do not have to buy and mix a surfactant of their own.

161.    But a major part of Chevron's departure from the Paraquat business was its knowledge that Paraquat was already causing progressive neurodegenerative disease in its customers.

162.    At the time it ended its partnership with Syngenta, Chevron knew that there were no plans to warn end-users or anyone else about the dangers of low-dose Paraquat exposure.

163.    At the time it ended its partnership with Syngenta, Chevron knew that the surfactant it manufactured, X-77, was recommended for use with Paraquat, including on certain Paraquat labels that instructed end-users to use X-77.

164.    Chevron would continue to sell X-77 surfactants until at least 1993 and Chevron-designed and manufactured X-77 was still being sold on the market until at least approximately the late 1990s.

### Evidence of the Paraquat–Parkinson's Link Continues to Mount

165.    Syngenta and Chevron declined to perform simple neurological testing knowing that such testing would demonstrate the association of Paraquat and Parkinson's Disease/Neurological injury.

166.    Similarly, upon information and belief, LSU Defendants failed or declined to perform neurological testing on Paraquat, even though they knew or should have known that such testing would reveal such a link.

167.    In the registration of Paraquat for sale in the US Market, Chevron did not conduct any toxicology studies on its own but instead relied on the studies of Syngenta.

168.    Chevron later characterized Syngenta's studies as poorly done, outdated, and below the reasonable standards.

169.    Chevron had particular concerns that Syngenta had no evidence supporting that there were no chronic effects of continual Paraquat exposure.

170.    Syngenta did not perform any long-term neurotoxicity testing on Paraquat until 2003.

171.    Chevron never performed any long-term neurotoxicity testing on Paraquat.

172.    Upon information and belief, LSU Defendants never performed any neurotoxicity testing on Paraquat, despite conducting numerous studies in Louisiana regarding the efficacy of Paraquat in burn-down and pre-plant applications and despite having knowledge that Paraquat was toxic to human health.

173.    Syngenta and Chevron both refused to perform any neurotoxicity testing on Paraquat with surfactant as used in a real-world application.

174.    As the years progressed, evidence that Paraquat causes Parkinson's continued to mount. In light of this, Syngenta commissioned a series of in-house studies in 2003 to attempt to invalidate the scientific literature, which showed a significant decrease in dopaminergic neurons as a result of Paraquat exposure.

175.    In the first round of studies, the Syngenta scientist used a manual method for counting dopaminergic neurons. This led the scientist to conclude that there was no statistically-significant loss of dopaminergic neurons following Paraquat exposure, thereby contradicting the growing scholarly literature and supporting Syngenta's public statements that Paraquat does not cause Parkinson's disease.

176.    Syngenta saw to it that the scientist's conclusions were published to much fanfare and widely reported in various publications.

177.    But the Syngenta scientist later gained the ability to conduct a more precise, automated count of dopaminergic neurons. The Syngenta scientist repeated the same studies, this time using the more precise counting method. In this second round, the scientist discovered a statistically-significant loss of dopaminergic neurons following Paraquat exposure. The scientist concluded that, thanks to the more precise methodology in the second round of studies, it was highly likely that the growing body of scientific literature was correct: Paraquat exposure is associated with loss of dopaminergic neurons.

178.    Unlike the first round of studies, Syngenta never published or otherwise publicly released the second round of the scientist's studies—the ones linking Paraquat to Parkinson's disease.

179.    Though, to date, Syngenta has never contested the results of the second round of studies, they have withheld them from the public, the medical and scientific communities, and state and federal regulators. Syngenta has, however, repeatedly referred to the first round of studies publicly and in submissions to state and federal regulators.

180.    In about 2004 or 2005, Syngenta communicated to its internal scientific and toxicology teams that under no circumstances should Paraquat be measured in the brain tissue of lab animals because detecting even a small amount could have negative implications for the company.

27

181.    In addition to suppressing the results of its own studies showing a Paraquat-Parkinson's connection, Syngenta also engaged in an active campaign to discredit outside scientists whose research supports the growing consensus that Paraquat causes Parkinson's disease.

182.    For instance, Syngenta established a so-called Paraquat SWAT team to attack and discredit scientists whose results are contrary to Syngenta's public statements. That team has taken various actions, including pressuring publishers to remove the word "Paraquat" from abstracts of scientific articles, apparently on the theory that few people read more than the abstract.

183.    Syngenta also developed a website called "paraquat.com" which claims to share up-to-date information on the safety of Paraquat. Syngenta paid internet marketing consultants to ensure that paraquat.com would appear higher in Google search results as opposed to other websites that would have warned end-users of Paraquat's dangers. The website states that the science does not support a link between Paraquat exposure and Parkinson's disease, despite Syngenta's knowledge to the contrary.

184.    Syngenta also launched a coordinated campaign to influence both academic and regulatory institutions to convince them of Paraquat's safety and efficacy and to negate the studies linking Paraquat and Parkinson's Disease. LSU, through the LSU Defendants was one of the influenced academic institutions and took Syngenta donations and, recognizing the value of its relationship with Syngenta, continued to broadly promote Paraquat without ever warning of a Paraquat/Parkinson's link.

185.    Yet Syngenta studies from the same time period tell a vastly different story.

186.    To begin with, several Syngenta-conducted or -commissioned studies from the late 1990s and early 2000s confirmed what studies from earlier periods had already discovered: the intended users of Paraquat rarely used full safety equipment and came into frequent contact with small amounts of Paraquat while mixing (including adding the required surfactant) and spraying the herbicide. For instance, a 1995 study of workers in U.S. orchards found that only half of Paraquat users wore gloves.

187.    Further, a 1997 Syngenta study based in Spain required workers to wear the recommended personal protective equipment as a condition of study participation. Despite this, almost all of the study participants tested positive for Paraquat in their urine.

188.   Other studies continued to confirm that Paraquat enters the brain. Concerned that lab rats may be too different from humans to generalize earlier findings, Syngenta commissioned a study using squirrel monkeys in 2010. Following administration of small, fixed doses of Paraquat, the squirrel monkeys were actually found to be *more* sensitive to Paraquat toxicity than mice. What's more, analysis of the monkey's frontal cortex region showed no measurable decline in Paraquat levels in samples taken six weeks apart. Syngenta scientists concluded that Paraquat can enter the brain, that mammals similar to humans are more sensitive to the neurotoxic effects of Paraquat than lab rats, and that Paraquat does not easily leave the brain once there.

189.   Syngenta did not publish the squirrel monkey studies. Nor did it report them to state or federal regulators. Syngenta kept these studies hidden.

190.   But Syngenta did, in 2011, publish the results of what it called an epidemiological study of Syngenta employees involved in Paraquat manufacturing. The study purported to show that there is no statistically-significant increase in the prevalence of Parkinson's disease among Syngenta employees who manufactured Paraquat. But the study was rejected by every reputable journal to which it was submitted. Even Syngenta's own internal reviewers questioned the study's validity. For one thing, Paraquat manufacture is a closed process: workers in the study (unlike Paraquat end-users) did not actually come into contact with Paraquat during manufacturing. Further, the Syngenta doctor that conducted the study relied exclusively on workers' death certificates to determine whether or not they had Parkinson's disease—a notoriously unreliable methodology because death certificates rarely list underlying conditions that ultimately cause death. In the end, Syngenta essentially self-published the study in an open-source journal after paying a substantial fee to publish.

191.   Despite these shortcomings, Syngenta has frequently cited this study as disproving any epidemiological link between Paraquat and Parkinson's disease, both to the public and to state and federal regulators.

192.   Paraquat.com claims that there is no epidemiological evidence of a Paraquat-Parkinson's connection. But Syngenta has never conducted an epidemiological study save for the fatally flawed 2011 study that it self-published.

### *Warnings of a Paraquat–Parkinson's Link*

193.   At no time has Syngenta publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment.

194.    At no time has Chevron publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment.

195.    At no time has any LSU Defendant publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment.

196.    This despite the fact that Syngenta and Chevron have admitted that a Paraquat-Parkinson's causal connection is biologically plausible, that the numerous internal studies that they have conducted and shared with each other and their agents and partners demonstrate a Paraquat-Parkinson's causal connection, and that numerous independent epidemiological studies have sounded the alarm of the catastrophic consequences.

197.    Defendants continue to publicly assert that Paraquat is safe and that it does not cause Parkinson's disease or precursor ailments.

198.    Defendants committed, and continue to commit, affirmative independent acts of concealment (including acts and omissions) to intentionally mislead end-users and the medical community as alleged above. This concealment prevented end-users, including Plaintiff, from asserting his legal rights because the facts to support their causes of action were not apparent to a reasonably diligent person.

199.    Defendants committed, and continue to commit, acts of fraud that caused end-users, including Plaintiff, to relax their vigilance or deviate from their right of inquiry into the facts alleged in this complaint.

### *Plaintiff Was an End-User of Paraquat and Exposed in Reasonably Foreseeable Ways*

200.    Plaintiff Bobby Lavelle Kelly worked as a farmer for most of his life. Part of his work involved spraying Paraquat on his farmland in Morehouse Parish from approximately 1988 – 2005.

201.    In the course of his work, Plaintiffs estimate that Mr. Kelly mixed, loaded, and sprayed Paraquat about 25-35 days per year for over 18 years—mixing and spraying around eight hours per day on each day that he mixed, loaded, and sprayed Paraquat.

202.    Plaintiff was exposed to Paraquat designed by Syngenta.

203.    Plaintiff was exposed to Paraquat manufactured by Syngenta.

204.    Plaintiff was exposed to Paraquat distributed by Syngenta.

205.    Plaintiff was exposed to Paraquat designed by Chevron.

206.    Plaintiff was exposed to Paraquat manufactured by Chevron.

207. Plaintiff was exposed to Paraquat distributed by Chevron.

208. Plaintiff was exposed to Paraquat tested, marketed, and promoted by LSU Defendants.

209. Plaintiff was exposed to surfactants and other chemicals designed and manufactured by Chevron for use with Paraquat, which make Paraquat more neurotoxic.

210. Plaintiff would mix Paraquat, load it onto his tractor, and spray Paraquat.

211. Plaintiff would come into contact with Paraquat when it was mixed, loaded, and applied.

212. Plaintiff would come into contact with Paraquat when he cleaned equipment or other surfaces contaminated with Paraquat.

213. Paraquat came into contact with Plaintiff Bobby Lavelle Kelly's skin and clothes.

214. Plaintiff inhaled Paraquat, including in a manner such that Paraquat came into contact with his olfactory bulb.

215. Plaintiff was a certified applicator of Paraquat.

216. Plaintiff used Paraquat as intended—that is, as an herbicide.

217. Plaintiff was aware of and relied upon Syngenta's representations that Paraquat is safe, including representations that Paraquat can be used without personal protective equipment.

218. Plaintiff was aware of and relied upon Chevron's representations that Paraquat is safe, including representations that Paraquat can be used without personal protective equipment.

219. Plaintiff was aware of and relied upon LSU's representations that Paraquat is safe, including representations that Paraquat can be used without personal protective equipment.

220. Upon information and belief, Plaintiff was aware of and relied upon LSU Defendants' Paraquat marketing and promotional materials when he decided to use Paraquat.

221. Upon information and belief, Plaintiff was aware of and relied upon LSU Defendants' Paraquat marketing and promotional materials when he chose whether and which surfactants or oil to add to Paraquat that made it more likely to be dermally absorbed.

222. Plaintiff Bobby Lavelle Kelly would not have purchased or used Paraquat if he had known that it could cause neurological injury, Parkinson's disease.

223. Plaintiff would not have used Paraquat while wearing minimal-to-no protective equipment if he had known that Paraquat could cause neurological injury, Parkinson's disease.

31

224.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

225.    At all relevant times, it was reasonably foreseeable that Paraquat could enter Plaintiff's body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

### *Plaintiff Was Injured by His Contact with Paraquat*

226.    As a result of Plaintiff's contact with Paraquat, Plaintiff Bobby Lavelle Kelly developed Parkinson's disease.

227.    Parkinson's disease is progressive and cannot be diagnosed using a blood test or other immediately-verifiable methodology.

228.    Many individuals who are eventually have a Parkinson's diagnosis confirmed by neurologists or movement disorder specialists first received a tentative Parkinson's diagnosis and a referral to a specialist by a family doctor or general practitioner.

229.    Plaintiff Bobby Lavelle Kelly's Parkinson's disease progressed to become entirely debilitating. Plaintiff Bobby Lavelle Kelly lost the ability to control his motor functions. He became unable to live independently. Parkinson's disease results in permanent physical injuries, pain, mental anguish, and disability. For more than two decades, Plaintiff Bobby Lavelle Kelly endured these injuries until he passed away on January 26, 2023.

230.    Plaintiff Bobby Lavelle Kelly has incurred significant costs and expenses related to medical care and treatment, funeral expenses, as well as related costs.

231.    Plaintiff Bobby Lavelle Kelly became unable to work or hold down steady employment.

232.    Plaintiff Bobby Lavelle Kelly has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this Court.

233.    Plaintiff Bobby Lavelle Kelly has suffered special (economic damages) in a sum in excess of the jurisdictional minimum of this Court.

32

234. As Plaintiff Bobby Lavelle Kelly's condition deteriorated, his wife and children, Plaintiffs Dorothy Dianne Rogers Kelly, Melissa Sawyer, and Bobby Dale Kelly, had to provide additional assistance to and suffer loss of companionship and consortium from Bobby Lavelle Kelly.

### Plaintiff's Claims Is Timely

235. Plaintiffs filed suit within one year of learning that Plaintiff Bobby Lavelle Kelly's exposure to Paraquat and/or surfactant designed, formulated, and manufactured by Syngenta or Chevron and tested, promoted, and popularized by the LSU Defendants caused Bobby Lavelle Kelly's Parkinson's disease.

236. Further, Plaintiffs filed suit within one year of Plaintiff Bobby Lavelle Kelly's passing on January 26, 2023.

237. Prior to the date on which Plaintiffs made the connection between his Parkinson's diagnosis and the tortious conduct of Defendants, Plaintiffs had no reason to suspect that Bobby Lavelle Kelly's injuries had anything to do with his exposure.

238. Plaintiff Bobby Lavelle Kelly had no way of connecting his injuries to Paraquat and to the tortious conduct until well after his diagnosis.

239. Plaintiffs were never told either by a medical professional, by media, or by the Defendants, that exposure to Paraquat could cause Plaintiff to suffer Parkinson's disease or a precursor ailment.

240. Plaintiffs did not know of the claims and their underlying facts asserted in this complaint, nor could any reasonable prudent person know of such claims.

241. Plaintiffs did not possess the sufficient critical facts to put them on notice that the wrongs and the acts and omissions discussed herein had been committed because Defendants were and continue to conceal the acts and omissions noted above.

242. Plaintiffs were reasonably unaware, and had no reasonable way of knowing, that their injuries described above were caused by Defendants' conduct.

243. Further, Defendants' acts and omissions misled Plaintiffs in regard to their causes of action and prevented them from asserting such rights because the facts which would support their causes of action as alleged in this complaint were not apparent to a reasonably prudent person.

244. Defendants also prevented Plaintiffs from asserting their rights by committing affirmative independent acts of concealment as noted above upon which Plaintiffs relied.

245.   Defendants' misconduct and fraudulent concealment of the relevant facts deprived Plaintiffs of vital information essential to the pursuit of the claims in this complaint, without any fault or lack of diligence on their part. Plaintiffs relied on Defendants' misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendants' tortious conduct.

246.   Defendants also affirmatively induced Plaintiffs to delay bringing this petition by and through their acts and omissions as alleged herein.

247.   In addition to the acts and omissions noted above, Defendants consistently misrepresented to Plaintiffs and the general public that Paraquat was not the cause of any of Plaintiff's injuries to delay their bringing a claim against Defendants.

248.   Plaintiffs relied on Defendants misrepresentations.

*Plaintiffs Make No Claims Under Federal Law*

249.   Paraquat is regulated by government authorities, but Plaintiffs make no allegations under those statutes.

a.   La. R.S. § 3:3221 regulates the labeling, distribution, use, and application of pesticides within the State of Louisiana, requires that pesticides be registered with the Louisiana Department of Agriculture before they are sold in Louisiana.

b.   The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

c.   FIFRA has no private right of action and state tort claims do not arise under FIFRA.

250.   The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if

complied with, together with any requirements imposed under section 136a(d) of this title, are

adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or (3) the label does not

contain a warning or caution statement which may be necessary and if complied with, together

with any requirements imposed under section 136a(d) of this title, is adequate to protect health and

the environment," 7 U.S.C. § 136(q)(1)(G).

251.    As a result, a pesticide may be misbranded despite an EPA determination that it

met FIFRA's registration criteria. In other words, notwithstanding its registration, a pesticide is

misbranded if its label contains "false or misleading" statements, has inadequate instructions for

use, or omits warnings or cautionary statements necessary to protect human health. Similarly, a

pesticide may be found to cause unreasonable adverse effects on humans when used according to

the approved label despite a determination by the EPA that it would not.

252.    Plaintiffs do not seek in this action to impose on Defendants any labeling or

packaging requirement in addition to or different from those required under FIFRA. Any allegation

in this Complaint that a Defendant breached a duty to provide adequate directions for the use of or

warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed,

suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or

deceptive practice regarding Paraquat, is intended and should be construed to be consistent with

that alleged breach concealment, suppression, or omission, or unfair or deceptive practice having

rendered the Paraquat "misbranded" under FIFRA. However, Plaintiffs bring claims and seeks

relief in this action only under state law. Plaintiffs do not bring any claims or seek any relief in

this action under FIFRA.

253.    Plaintiffs' causes of action are solely under state law.

## CAUSES OF ACTION

**COUNT I— MANUFACTURING AND DESIGN DEFECT UNDER LSA-RS 9:2800.54
AND LSA-RS 9:2800.56 OF THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA)
AGAINST SYNGENTA**

254.    Plaintiffs incorporate all other allegations herein.

255.    Syngenta designed, manufactured, and sold Paraquat that Plaintiff was exposed to.

256.    Plaintiff's exposure to Paraquat caused Plaintiff's Parkinson's disease.

257.    Plaintiff is an ordinary consumer of Paraquat and was also exposed by virtue of his

close contact with ordinary consumers of Paraquat.

258.    For many years, Plaintiff used Syngenta's paraquat products in Louisiana repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

259.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way and was at all times in a defective condition that made them unreasonably dangerous, including:

       a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

       b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury when personal protective equipment was not used.

       c.    An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

260.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an unintended but reasonably foreseeable way and was in a defective condition that made it unreasonably dangerous, including:

       a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

       b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury when personal protective equipment was not used.

       c.    An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

261.    Further, a reasonable person would conclude that the possibility and seriousness of neurological injury caused by Paraquat, including Parkinson's disease and precursor ailments, outweighed the burden or cost of making Paraquat safe. In particular:

       a.    It is highly likely that low-dose Paraquat exposure will result in neurological injury, including Parkinson's disease or a precursor ailment that will progress into Parkinson's disease.

36

b.      Parkinson's disease is degenerative and chronic; there is no cure. Parkinson's disease causes intense suffering and a breakdown of the ability to live a normal life. Parkinson's disease is fatal.

c.      The burden of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

d.      The cost of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

262.    Plaintiff could not, by the exercise of reasonable care, discover the defective condition of Defendant's products and/or perceive its defectiveness or dangers prior to its use.

263.    The Paraquat to which Plaintiff was exposed was unreasonably dangerous when it left Syngenta's possession and control.

264.    Paraquat was a substantial, proximate, and contributing factor in causing Plaintiff's injuries.

265.    As a proximate result of Syngenta's acts and omissions and Plaintiff's use of Syngenta's defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this complaint, including, but not limited to, the following:

266.    Plaintiff required healthcare and services;

267.    Plaintiff incurred medical and related expenses;

268.    Plaintiff incurred funeral and related costs; and

269.    Plaintiff suffered mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

270.    Plaintiffs Dorothy Dianne Rogers Kelly, Melissa Sawyer, and Bobby Dale Kelly suffered and will continue to suffer a loss of consortium.

**COUNT II— MANUFACTURING AND DESIGN DEFECT UNDER LSA-RS 9:2800.54 AND LSA-RS 9:2800.56 OF THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA) AGAINST CHEVRON**

271.    Plaintiffs incorporate all other allegations herein.

272.    Chevron designed, manufactured, and sold Paraquat that Plaintiff was exposed to.

273.    Plaintiff's exposure to Paraquat caused Plaintiff's Parkinson's disease.

274.    Plaintiff is an ordinary consumer of Paraquat and was also exposed by virtue of his close contact with ordinary consumers of Paraquat.

37

275.    For many years, Plaintiff used Chevron's paraquat products in Louisiana repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

276.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way and was at all times in a defective condition that made them unreasonably dangerous, including:

a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury when personal protective equipment was not used.

c.    An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

277.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an unintended but reasonably foreseeable way and was in a defective condition that made it unreasonably dangerous, including:

a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury when personal protective equipment was not used.

c.    An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

278.    Further, a reasonable person would conclude that possibility and seriousness of neurological injury caused by Paraquat, including Parkinson's disease and precursor ailments, outweighed the burden or cost of making Paraquat safe. In particular:

a.    It is highly likely that low-dose Paraquat exposure will result in neurological injury including Parkinson's disease or a precursor ailment that will progress into Parkinson's disease.

b.    Parkinson's disease is degenerative and chronic; there is no cure. Parkinson's disease causes intense suffering and a breakdown of the ability to live a normal life. Parkinson's disease is fatal.

c.    The burden of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

d.    The cost of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

279.    Plaintiff could not, by the exercise of reasonable care, discover the defective condition of Defendant's products and/or perceive its defectiveness or dangers prior to its use

280.    The Paraquat to which Plaintiff was exposed was unreasonably dangerous when it left Chevron's possession and control.

281.    Paraquat was a substantial, proximate, and contributing factor in causing Plaintiff's injuries.

282.    As a proximate result of Chevron's acts and omissions and Plaintiff's use of Chevron's defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this complaint, including, but not limited to, the following:

283.    Plaintiff required healthcare and services;

284.    Plaintiff incurred medical and related expenses;

285.    Plaintiff incurred funeral and related costs; and

286.    Plaintiff suffered mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

287.    Plaintiff Dorothy Dianne Rogers Kelly, Melissa Sawyer, and Bobby Dale Kelly suffered and will continue to suffer a loss of consortium.

**COUNT III— FAILURE TO WARN UNDER LSA-RS 9:2800.57 OF THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA) AGAINST SYNGENTA**

288.    Plaintiffs incorporate all other allegations herein.

289.    Syngenta is also liable to Plaintiff under a products liability theory based on its failure to adequately warn of the risks of Paraquat.

290.    When Syngenta manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to Syngenta in light of scientific knowledge that was generally

accepted in the scientific community as well as Syngenta's own internal research and information that:

      a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

      b.    When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

291.    The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

292.    An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

293.    Syngenta failed to warn of the potential risk of permanent, irreversible neurological damage from low-dose exposure to Paraquat.

294.    A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Syngenta's failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

295.    As a direct and proximate result of Syngenta marketing a defective product without adequate warning, Plaintiffs suffered the injuries described in this Complaint.

### COUNT IV— FAILURE TO WARN UNDER LSA-RS 9:2800.57 OF THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA) AGAINST CHEVRON

296.    Plaintiffs incorporate all other allegations herein.

297.    Chevron is also liable to Plaintiff under a products liability theory based on its failure to adequately warn of the risks of Paraquat.

298.    When Chevron manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to Chevron in light of scientific knowledge that was generally accepted in the scientific community as well as Chevron's own internal research and information that:

a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.    When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

299.    The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

300.    An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

301.    Chevron failed to warn of the potential risk of permanent, irreversible neurological damage from low-dose exposure to Paraquat.

302.    A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Chevron's failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

303.    As a direct and proximate result of Chevron marketing a defective product, Plaintiffs suffered the injuries described in this Complaint.

## COUNT V—NEGLIGENCE AGAINST SYNGENTA

304.    Plaintiffs incorporate all other allegations herein.

305.    Syngenta designed, manufactured, distributed, and sold Paraquat to which Plaintiff was exposed.

306.    The Paraquat to which Plaintiffs were exposed was used in the intended and/or a reasonably foreseeable manner.

307.    At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Syngenta owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiffs.

308.    When Syngenta designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Plaintiffs were exposed, it was reasonably foreseeable that Paraquat:

a.    Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.    When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

309.    In breach of the aforementioned duties to Plaintiff, Syngenta negligently:

a.    Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.    Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c.    Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d.    Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

e.    Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were

42

likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f.  Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

g.  Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

310.  Syngenta knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

311.  As a direct and proximate result of Syngenta's negligence, Plaintiffs suffered the injuries described in this Complaint.

## COUNT VI—NEGLIGENCE AGAINST CHEVRON

312.  Plaintiffs incorporate all other allegations herein.

313.  Chevron designed, manufactured, distributed, and sold Paraquat to which Plaintiffs were exposed.

314.  The Paraquat to which Plaintiffs were exposed was used in the intended and/or a reasonably foreseeable manner.

315.  At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Chevron owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiffs.

316.  When Chevron designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Plaintiff was exposed, it was reasonably foreseeable that Paraquat:

a.  Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.  When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has

been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

317.   In breach of the aforementioned duties to Plaintiff, Chevron negligently:

a.   Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.   Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c.   Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d.   Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

e.   Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f.   Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

44

      g.     Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

318.     Chevron knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

319.     As a direct and proximate result of Chevron's negligence, Plaintiffs suffered the injuries described in this Complaint.

## COUNTS VII & VIII—NEGLIGENCE & NEGLIGENT MISREPRESENTATION AGAINST LSU DEFENDANTS

320.     Plaintiffs incorporate all other allegations herein.

321.     LSU Defendants researched, tested, marketed, and promoted the Paraquat to which Plaintiff Bobby Lavelle Kelly was exposed.

322.     The Paraquat to which Plaintiff was exposed was used in the intended and/or a reasonably foreseeable manner.

323.     LSU Defendants are required, per the original enabling statute of the LSU AgCenter, to give "instruction and practical demonstrations in agriculture and home economics to persons not attending or resident in said colleges in the several communities and imparting to such persons information on said subjects through field demonstrations, publications, and otherwise." United States Statutes at Large, 63 Cong. Ch. 79, May 8, 1914, 38 Stat. 372.

324.     Because the dissemination of research-based information on agriculture is a mandatory, and not a discretionary function of the LSU AgCenter, LSU Defendants are not entitled to discretionary immunity under La. R.S. 9:2798.1 because LSU Defendants were operationally negligent that exercise.

325.     As described in further detail herein, LSU Defendants were operationally negligent in the exercise of a mandatory function in that they acted negligently in the selecting the content of the information supplied to the public about Paraquat and the manner in which information regarding Paraquat was disseminated.

326.     The AgCenter's mandate is explicitly in service of the public or "persons not attending...said colleges in the several communities." The LSU Defendants owe a duty to the public, to the agricultural community, and to Plaintiff Bobby Lavelle Kelly to disseminate

information about agriculture and home economics in a manner that does not present an unreasonable risk of harm to the agricultural community and the public.

327.    The duty owed by LSU Defendants to the public, to the agricultural community, and to Plaintiff Bobby Lavelle Kelly included a duty to supply correct information—or at a minimum, to exercise reasonable care to ensure the accuracy of the information they disseminated.

328.    At all times relevant to this claim, in researching, testing, marketing, and promotion of Paraquat, LSU Defendants held themselves out as objective third-party resources for farming communities delivering research-based recommendations to Louisiana farmers.

329.    At all times relevant to this claim, in researching, testing, marketing, and promotion of Paraquat, LSU Defendants had a duty to conform itself to the behavior of an objective third-party resource for farming communities delivering research-based recommendations to Louisiana farmers.

330.    At all times relevant to this claim, in researching, testing, marketing, and promotion of Paraquat, LSU Defendants had a duty to conform itself to the behavior of a reasonable research university in delivering information about agriculture to Louisiana farmers and the public.

331.    At all times relevant to this complaint, in researching, testing, marketing, and promotion of Paraquat, LSU owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiffs.

332.    At all times relevant to this complaint, in researching, testing, marketing, and promotion of Paraquat, LSU owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be receive and rely on information disseminated by LSU and the LSU AgCenter, including Plaintiff and the other farmers with whom he worked.

333.    At all times relevant to this complaint, LSU Defendants owed a duty in all of their undertakings, including in the dissemination of information concerning Paraquat, to exercise reasonable care to ensure they did not create unreasonable risks of personal injury to others.

334.    At all times relevant to this complaint, it was foreseeable to LSU Defendants that consumers, and specifically the Louisiana agricultural community targeted by the LSU AgCenter, would rely upon the information disseminated, including about Paraquat's safety and efficacy, and would use that information in making decisions about whether to purchase and use Paraquat and in what steps, if any, they would take to mitigate the risks posed by Paraquat exposure.

335.    When LSU Defendants researched, tested, marketed, and promoted the Paraquat to which Plaintiff Bobby Lavelle Kelly was exposed, it was reasonably foreseeable that Paraquat:

a.    Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.    When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

336.    When LSU Defendants researched, tested, marketed, and promoted the Paraquat to which Plaintiff Bobby Lavelle Kelly was exposed, it was reasonably foreseeable and specifically intended that information disseminated by LSU Defendants:

a.    Would reach members of the Louisiana agricultural community.

b.    Would be relied on by members of the Louisiana agricultural community in making decisions about whether to purchase Paraquat; when, how, and in what manner and frequency to use Paraquat; and what steps, if any, should be taken to mitigate risks posed by Paraquat.

c.    Would be seen as a reliable and independent source of information.

d.    Would be perceived as a research-based seal of approval for Paraquat.

e.    Would be perceived as the complete and full picture on Paraquat.

f.    Would be taken as an indication that Paraquat was safe to use in the manner suggested and promoted by LSU Defendants.

337.    In breach of the aforementioned duties to Plaintiffs, LSU Defendants were operationally negligent in carrying out non-discretionary functions required of them by statute in that they negligently:

a.    Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

47

b.      Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

c.      Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

d.      Marketed and promoted Paraquat to despite the fact that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

e.      Marketed and promoted Paraquat to despite the fact that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f.      Worked with Chevron and Syngenta to register Paraquat with the Louisiana Department of Agriculture and Forestry so that Paraquat could be sold to and/or used by Plaintiff and to consumers in Louisiana without adequate research or testing into its safety.

g.      Failed to disclose its financial support from and close business ties with Syngenta and Chevron such that Plaintiff and ordinary consumers and users could look critically at LSU Defendants' marketing and promotion of Paraquat.

h.      Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

i.      Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

j.    Failed to ensure that the information they disseminated was accurate and not materially misleading, false, or unreasonably dangerous to consumers and agricultural workers such as Plaintiff.

338.    LSU Defendants knew or should have known that end-users such as Plaintiff Bobby Lavelle Kelly would not realize the dangers of exposure to Paraquat and failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

339.    Were it not for the direct assistance and operational negligence of LSU Defendants, Syngenta and Chevron would not have been as successful in popularizing the use of Paraquat in Louisiana.

340.    Were it not for the direct assistance and operational negligence of LSU Defendants, Syngenta and Chevron would not have been as successful in keeping the link between Paraquat and Parkinson's Disease from Louisiana consumers and end-users of Paraquat, such as Plaintiff.

341.    There is no legitimate economic, social, political, or public policy rationale that would justify the decisions of the LSU Defendants to engage in the acts or omissions as described herein.

342.    The decisions of LSU Defendants to engage in the acts or omissions as described herein were not grounded in social, economic, or political policy.

343.    Plaintiff Bobby Lavelle Kelly, and the other farmers with whom he worked, reasonably relied on LSU Defendants' assertions that Paraquat was safe and effective for use as a pre-plant and burn-down applicator and as a desiccate to kill cotton plants in preparation for harvest.

344.    As a direct and proximate result of LSU's operational negligence, through its non-discretionary acts and omissions, Plaintiffs suffered the injuries described in this Complaint.

**COUNT IX—VIOLATIONS OF LOUISIANA UNFAIR TRADE PRACTICES ACT, LA. R.S. § 51:1405 AGAINST SYNGENTA**

345.    Plaintiffs incorporate all other allegations herein.

346.    Louisiana Revised Statute § 51:1405 ("Louisiana Unfair Trade Practices Act") says that "[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

347.    Syngenta's practices as described herein are unfair and deceptive practices that violate LUTPA because the practices were and are intended to deceive consumers and occurred

49

and continue to occur in the course of conduct involving trade and commerce in Iberville Parish and throughout Louisiana.

348.    During the relevant periods and as detailed further herein, Syngenta engaged in unconscionable, unfair and/or deceptive acts or practices in commerce in violation of the LUTPA by manufacturing, designing, marketing, promoting, and selling Paraquat despite actual knowledge of the dangers posed by Paraquat.

349.    Syngenta fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media and purported "community outreach" programs, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat.

350.    Syngenta's acts of deception were successful and did mislead reasonable consumers to grossly underestimate the risks associated with Paraquat.

351.    Syngenta's unfair acts or practices include but are not limited to:

   a.    Designing, manufacturing, formulating, and packaging Paraquat such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

   b.    Promoting, marketing, and selling Paraquat without adequate warning despite having actual knowledge that when Paraquat was inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

   c.    Engaging in a campaign to co-opt public research institutions and strengthen their brand in Louisiana to ensure that the causal link between Paraquat and Parkinson's disease remained hidden from the public, from Plaintiff, and from the medical and scientific communities.

352.    Syngenta's unconscionable, unfair, or deceptive acts or practices in violation of LUTPA offend public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will, and caused substantial injury to Plaintiff.

353.    If Plaintiff had known the true facts concerning the risks associated with Paraquat exposure, Plaintiff would have used a safer alternative.

354.    Syngenta's violations of LUTPA present a continuing risk to Plaintiff and the general public. No public policy justifies Syngenta's conduct.

355.    La. R.S. § 51:1409(A) allows any person (including any legal entity, pursuant to La. R.S. § 51:1402(8)) who suffers "any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment of an unfair or deceptive method, act, or practice declared unlawful by R.S. § 51:1405" to bring an action to recover actual damages.

356.    La. R.S. § 51:1409(A) further instructs that "If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained...[and] reasonable attorney fees and costs."

357.    As a direct and proximate result of Syngenta's violations of the LUTPA, Plaintiffs have suffered and continues to suffer losses constituting injury-in-fact. Plaintiffs are entitled, and does hereby seek, to recover treble damages and its actual damages and its attorneys' fees and costs.

## COUNT X— VIOLATIONS OF LOUISIANA UNFAIR TRADE PRACTICES ACT, LA. R.S. § 51:1405 AGAINST CHEVRON

358.    Plaintiffs incorporate all other allegations herein.

359.    Louisiana Revised Statute § 51:1405 ("Louisiana Unfair Trade Practices Act") says that "[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

360.    Chevron's practices as described herein are unfair and deceptive practices that violate LUTPA because the practices were and are intended to deceive consumers and occurred and continue to occur in the course of conduct involving trade and commerce in Iberville Parish and throughout Louisiana.

1.      During the relevant periods and as detailed further herein, Chevron engaged in unconscionable, unfair and/or deceptive acts or practices in commerce in violation of the LUTPA

51

by manufacturing, designing, marketing, promoting, and selling Paraquat despite actual knowledge of the dangers posed by Paraquat.

2.      Chevron fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media and purported "community outreach" programs, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat.

361.    Chevron's acts of deception were successful and did mislead reasonable consumers to grossly underestimate the risks associated with Paraquat.

362.    Chevron's unfair acts or practices include but are not limited to:

a.      Designing, manufacturing, formulating, and packaging Paraquat such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.      Promoting, marketing, and selling Paraquat without adequate warning despite having actual knowledge that when Paraquat was inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

c.      Engaging in a campaign to co-opt public research institutions and strengthen their brand in Louisiana to ensure that the causal link between Paraquat and Parkinson's disease remained hidden from the public, from Plaintiffs, and from the medical and scientific communities.

363.    Chevron's unconscionable, unfair, or deceptive acts or practices in violation of LUTPA offend public policy, are immoral, unethical, oppressive, and unscrupulous, as well as malicious, wanton, and manifesting of ill will, and caused substantial injury to Plaintiff.

364.    If Plaintiff had known the true facts concerning the risks associated with Paraquat exposure, Plaintiff would have used a safer alternative.

365.    Chevron's violations of LUTPA present a continuing risk to Plaintiff and the general public. No public policy justifies Chevron's conduct.

366.    La. R.S. § 51:1409(A) allows any person (including any legal entity, pursuant to La. R.S. § 51:1402(8)) who suffers "any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment of an unfair or deceptive method, act, or practice declared unlawful by R.S. § 51:1405" to bring an action to recover actual damages.

367.    La. R.S. § 51:1409(A) further instructs that "If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained…[and] reasonable attorney fees and costs."

368.    As a direct and proximate result of Chevron's violations of the LUTPA, Plaintiffs have suffered and continues to suffer losses constituting injury-in-fact. Plaintiffs are entitled, and does hereby seek, to recover treble damages and its actual damages and its attorneys' fees and costs.

**COUNT XI—FRAUD & MISREPRESENTATION AGAINST SYNGENTA**

369.    Plaintiffs incorporate all other allegations herein.

370.    Syngenta designed, manufactured, formulated, distributed and/or sold the Paraquat to which Plaintiffs were exposed.

371.    Syngenta made misstatements concerning the safety of Paraquat. In particular, at all relevant times, Syngenta has publicly maintained that Paraquat does not cause Parkinson's disease or precursor ailments that will progress into Parkinson's disease.

372.    These misstatements were material in that Plaintiff relied on Syngenta's misstatements when decided to use or continue using Paraquat. Absent said misstatements, Plaintiff would not have used Paraquat.

373.    These misstatements were fraudulent in that Syngenta knew at all relevant times that Paraquat crossed the blood-brain barrier and/or was absorbed directly by the olfactory bulb, that Paraquat reduced the number of dopaminergic neurons, that Paraquat caused oxidative stress in the portion of the brain relevant to Parkinson's disease, and that studies (including internal Syngenta research) had connected Paraquat with Parkinson's disease.

374.    Plaintiff's reliance on Syngenta's misstatements was the factual and proximate cause of the injuries alleged in this Complaint.

**COUNT XII—FRAUD & MISREPRESENTATION AGAINST CHEVRON**

375.    Plaintiffs incorporate all other allegations herein.

376.    Chevron designed, manufactured, formulated, distributed and/or sold the Paraquat to which Plaintiff was exposed.

377.    Chevron made misstatements concerning the safety of Paraquat. In particular, at all relevant times, Chevron has publicly maintained that Paraquat does not cause Parkinson's disease or precursor ailments that will progress into Parkinson's disease.

378.    These misstatements were material in that Plaintiff relied on Chevron's misstatements when decided to use or continue using Paraquat. Absent said misstatements, Plaintiff would not have used Paraquat.

379.    These misstatements were fraudulent in that Chevron knew at all relevant times that Paraquat crossed the blood-brain barrier and/or was absorbed directly by the olfactory bulb, that Paraquat reduced the number of dopaminergic neurons, that Paraquat caused oxidative stress in the portion of the brain relevant to Parkinson's disease, and that studies (including internal Chevron research) had connected Paraquat with Parkinson's disease.

380.    Plaintiffs' reliance on Chevron's misstatements was the factual and proximate cause of the injuries alleged in this Complaint.

**COUNT XIII—CIVIL CONSPIRACY, AIDING-AND-ABETTING FRAUD AGAINST CHEVRON**

381.    Plaintiffs incorporate all other allegations herein.

382.    Chevron designed, manufactured, formulated, distributed and/or sold the Paraquat to which Plaintiff was exposed.

383.    At all relevant times, including after 1986, Chevron was aware that Paraquat crossed the blood-brain barrier and/or was absorbed directly by the olfactory bulb, that Paraquat reduced the number of dopaminergic neurons, that Paraquat caused oxidative stress in the portion of the brain relevant to Parkinson's disease, and that studies (including internal research conducted by Chevron) had connected Paraquat with Parkinson's disease.

384.    At all relevant times, including after 1986, Chevron knew that Syngenta was likewise aware that Paraquat crossed the blood-brain barrier and/or was absorbed directly by the olfactory bulb, that Paraquat reduced the number of dopaminergic neurons, that Paraquat caused oxidative stress in the portion of the brain relevant to Parkinson's disease, and that studies

(including internal research conducted by Syngenta and shared with Chevron) had connected Paraquat with Parkinson's disease.

385.    At all relevant times, including prior to and after 1986, Chevron was aware it had a duty to warn end-users of these risks associated with Paraquat use.

386.    At all relevant times, including after 1986, Chevron was aware that Syngenta continued to maintain that Paraquat does not cause Parkinson's disease or precursor ailments.

387.    At all relevant times, including after 1986, Chevron knew that Syngenta's actions constituted a breach of its duty to warn, its duty of care, and other duties as alleged herein.

388.    At all relevant times, including after 1986, Chevron knew that publicly revealing the link between Paraquat and Parkinson's disease would cause it and other companies involved in Paraquat, including Syngenta, to lose sales and/or become subject to regulatory enforcement.

389.    Chevron aided and abetted Syngenta's continued breach of its duties by failing to publicly disclose its knowledge that Paraquat causes Parkinson's disease thereby permitting Syngenta to continue to breach its duties as alleged herein.

390.    Louisiana Civil Code Article 2324 states, in pertinent part, "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person for the damage caused by said act."

391.    Chevron's actions aiding and abetting Syngenta were the factual and proximate cause of Plaintiff's injuries because, had Chevron publicly disclosed its knowledge that Paraquat causes Parkinson's disease, Plaintiff would not have purchased or used Paraquat.

392.    Chevron is liable, in solido, with any damage caused by Syngenta's tortious conduct.

## COUNT XIV—SURVIVAL DAMAGES PURSUANT TO LA. C.C. ART. 2315.1

393.    Plaintiffs incorporate all other allegations herein.

394.    Pursuant La. C.C. Art. 2315.1, the Petitioners are entitled to recover for the damages sustained by Kenneth St. Andre from the moments prior to the accident, i.e., pre-accident fear through the moment of his death. Accordingly, the Petitioners are entitled to recover survival damages, including:

    a. Medical Expenses;

    b. Loss of Earning Capacity and/or Loss of Wages;

    c. Lost Chance of Survival;

d. Loss of Enjoyment of Life

e. Physical pain and suffering;

f. Mental anguish, pain, and suffering, including contemplation of his impending death and pre-death fear.

## COUNT XV—WRONGFUL DEATH PURSUANT TO LA. C.C. ART. 2315.2

395. Plaintiffs incorporate all other allegations herein.

396. Pursuant La. C.C. Art. 2315.2, the Petitioners are entitled to recover damages in their individual capacity for the wrongful death of Kenneth St. Andre, including:

a. Funeral Expense and Burial Cost;

b. Mental Anguish, Grief, Pain, and Suffering (past, present, and future);

c. Loss of Support (past, present, and future);

d. Loss of Love and affection (past, present, and future);

e. Loss of Consortium (past, present, and future);

f. Loss of Society and Companionship (past, present, and future);

g. Loss of Service (past, present, and future).

### DEMAND FOR JURY TRIAL

397. Plaintiffs demand a jury trial on all issues contained herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that Defendants be duly served with a copy of the **First Supplemental and Amending and Reinstated Petition for Damages** and respectfully requests that this Court enter judgment in Plaintiffs' favor against all Defendants as follows:

(1) Judgment for Plaintiffs and against Defendants.

(2) For medical and related expenses, according to proof.

(3) For funeral and related costs, according to proof.

(4) For loss of earnings and/or earning capacity, according to proof.

(5) For exemplary or punitive damages, according to proof.

(6) For treble damages.

(7) For mental and physical suffering, past and present, according to proof.

(8) For loss of enjoyment of life, past and present, according to proof.

(9) For loss of consortium, according to proof.

(10) For Plaintiff's cost of suit herein.

(11)    For disgorgement of profits, according to proof.

(12)    Default judgment as a sanction for the bad faith destruction of evidence, if

any, and according to proof, if any.

(13)    For its attorneys' fees and costs.

(14)    For pre- and post-judgment interest

(15)    For such other and further relief as this Court may deem just and proper,

including prejudgment interest.

Dated: January 26, 2024                    Respectfully Submitted,

**LABORDE EARLES LAW FIRM, LLC.**

**NICHOLAS R. ROCKFORTE LA, Bar # 31305**
Derrick G. Earles (LA Bar No. 29570)
David C. Laborde (LA Bar No. 20907)
Kelby F. Rasmussen (LA Bar No. 36634)
1901 Kaliste Saloom Rd.
Lafayette, LA 70508
Phone: (337) 261-2617
Fax: (337) 261-1934
*Email for All Service of Process:*
service@onmyside.com
*Email for All Other Communications:*
nicholas@onmyside.com, and
denise@onmyside.com

-and-

Madeleine Clavier (LA Bar No. 37432)
Aimee Wagstaff (CO Bar No. 36819)
**WAGSTAFF LAW FIRM**
940 N. Lincoln St.
Denver, CO 80203
Phone: (337) 280-1074
Fax: (303) 376-6361
mclavier@wagstafflawfirm.com
awagstaff@wagstafflawfirm.com

*Attorneys for Plaintiffs*

A TRUE COPY
DATE 1/29/24
Deputy Clerk, Ex-Officio, Recorder, Iberville Parish, Louisiana

57

Iberville
AMY MATIRNE PATIN
BRANDY E. FOREMAN
Suit# C-C-82988
E-Filed on: 1/26/24 01:50 PM
Filed on: 1/26/24 02:29 PM
# of Pages:57

**PLEASE SERVE:**

1. **THE BOARD OF SUPERVISORS LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE**
*Through its registered agent of service of process:*

**THE BOARD OF SUPERVISORS, LSU**
Attn: Joy Henriott
1201 N. 3rd Street, Suite 7-300
Baton Rouge, Louisiana 70802

*And through*

**OFFICE OF THE LOUISIANA ATTORNEY GENERAL**
Attorney General Jeff Landry
1885 North Third Street
Baton Rouge, Louisiana 70802

*and*

**STATE OF LOUISIANA, OFFICE OF RISK MANAGEMENT**
Melissa Harris, Director
1201 N. 3rd Street
Baton Rouge, Louisiana 70802

2. **SYNGENTA CROP PROTECTION, LLC**
*Through Long Arm Statute:*
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

3. **CHEVRON U.S.A., INC.**
*Through Long Arm Statute:*
6001 Bollinger Canyon Road
D1248
San Ramon, California 94583

Iberville
AMY MATIRNE PATIN
BRANDY E. FOREMAN
Suit# C-C-82988
E-Filed on: 1/26/24 01:50 PM
Filed on: 1/26/24 02:29 PM
# of Pages:1